T.C. Memo. 2015-67

UNITED STATES TAX COURT

STEVEN F. JACOBY AND SARAH E. JACOBY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17636-12.　　　　　　　　　Filed April 6, 2015.

<u>William Bernard McCarthy</u> and <u>Jeffrey A. Neiman</u>, for petitioners.

<u>Daniel A. Rosen</u> and <u>Gail Campbell</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:　Respondent determined deficiencies of $856,243 and
$370,348 in and section 6663 civil fraud penalties of $642,182 and $277,761 with

[*2] respect to petitioners' Federal income tax for 1999 and 2000, respectively.[1]

The issues for decision are: (1) whether the statute of limitations bars the assessment and collection of deficiencies in income tax and additions to tax for 1999 and 2000; (2) whether Sarah Jacoby is entitled to relief from joint and several liability under section 6015 for 1999 and 2000; and (3) whether Steven Jacoby is liable for section 6663 civil fraud penalties for 1999 and 2000.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Florida at the time they filed their petition.

I.    Background

A.    Education and Early Work History

In 1982 Steven Jacoby graduated from college with a degree in accounting. After college he worked for the accounting firm of Touche Ross & Co. (now known as Deloitte) in an entry-level position within the firm's auditing department where he worked on audits of small, private companies. After six months during

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts have been rounded to the nearest dollar.

**[\*3]** which he did not have any contact with the tax side of the firm, he left to attend Fordham Law School.  While at law school he took some basic income tax courses.  He graduated in 1985 and was admitted to the New York bar in 1986.

After graduating Mr. Jacoby briefly worked as an associate for the admiralty law firm Burlingham, Underwood & Lord, where he worked on some tax and corporate law matters.  Mr. Jacoby was asked to leave the firm after approximately six months.

B.  Marketing Tax and Investment Strategies

In 1987 Mr. Jacoby's career shifted towards finance and marketing.  He joined Carnegie Hill, a New York-based wealth management firm, where his primary job was to attract new clients.  Later that year he moved to Twenty-First Securities Corp. (Twenty-First), where he worked as a licensed securities broker and an account executive.

As an account executive at Twenty-First, Mr. Jacoby mainly marketed tax and investment strategies to high net worth individuals and large companies.  He was paid 50% of the net profits from fees, commissions, and any revenue streams from his clients' transactions, earning between $5 and $6 million during the approximately nine years he worked exclusively with Twenty-First.

**[*4]**  Mr. Jacoby marketed strategies developed by Twenty-First's in-house counsel and the various accounting firms and law firms which served as Twenty-First's outside counsel.  Robert Gordon was Twenty-First's president, and Mark Fichtenbaum was its in-house tax director.  Both had been partners at prominent firms before joining Twenty-First and played important roles in developing strategies.  In addition to developing new strategies, Twenty-First's various tax experts worked to ensure that the strategies being developed were legal.

Every week Mr. Jacoby and other sales staff attended a sales meeting in which Mr. Gordon and Mr. Fichtenbaum would discuss Twenty-First's strategies.  They would also discuss the law and accounting firms that they were working with to develop and vet these strategies.  The sales staff would also receive marketing materials to pass on to prospective clients.  With this information Mr. Jacoby was able to understand the strategies well enough to explain to prospective clients the basics of how they worked.  However, if a prospective client asked for more detailed information, Mr. Jacoby would put him or her in touch with Mr. Gordon or Mr. Fichtenbaum.

C.    Working With James Haber

In 1996 Mr. Jacoby met James Haber.  Mr. Haber was the president of the Diversified Group, Inc. (DGI), which at the time was considered a leader in

[*5] developing tax-motivated transactions for corporations and high net worth individuals. The two men discussed the possibility of working together, and in 1996 Mr. Jacoby left Twenty-First to form his own company, SMD Capital Corp. (SMD), a wholly owned New York subchapter S corporation. Mr. Jacoby's plan was to market financial strategies and products offered by DGI in addition to those offered by Twenty-First.

Effective November 1, 1996, SMD and DGI entered into a joint venture agreement (JVA). Under the JVA, SMD and DGI agreed to work on "joint transactions" aimed at marketing income tax planning and tax strategies to clients.[2] Pursuant to the JVA Mr. Jacoby solicited clients on behalf of DGI and worked with them from introductions through closings as a go-between. SMD received 50% of the net profits from any clients Mr. Jacoby brought to DGI.

Much as he had with Twenty-First, Mr. Jacoby relied on DGI to develop and vet the strategies he marketed. Mr. Haber and DGI's in-house counsel, Orrin Tillowiz, developed many of the tax strategies while Mr. Jacoby reached out to prospective clients. As far as Mr. Jacoby knew at the time, all the transactions

---

[2] Under the JVA joint transactions are defined as "[t]hose transactions involving introductions of * * * [SMD] clients to * * * [DGI] as selling principals, and * * * [DGI] as principal for documentation purposes; such clients investing in transactions involving * * * [confidential investment vehicles and strategies]".

**[\*6]** entered into by his clients were carefully vetted and approved by DGI, DGI's outside counsel, and the client's counsel. He believed that Mr. Haber and DGI would not agree to be involved in any transactions that lacked substantial authority.

One of the strategies employed by DGI's clients was commonly known as a "Midco transaction". Midco transactions were designed as a way to effect the sale of a company using a tax-indifferent third party[3] as an intermediary in order to achieve capital gains treatment.[4] During the late 1990s Midco transactions occurred with some frequency. DGI's Midco transactions varied greatly in terms of the types of assets held by the companies that were being sold as well as the form of the company. For example, Mr. Jacoby witnessed deals involving sales of companies holding only ordinary assets and at least one deal that involved the sale of an S corporation. He did not witness any deals involving the sale of a company whose only asset was accounts receivable.

---

[3] Mr. Haber and DGI typically used entities owned by Indian tribes as the third parties.

[4] See Cullifer v. Commissioner, T.C. Memo. 2014-208, at \*38-\*40, for a more in-depth description of Midco transactions.

[*7] II.      1999 Transactions

A.      SMD Stock Sale

By January 1999 SMD had accounts receivable of $3,422,267 attributable to fees that Mr. Jacoby earned from his work with DGI.  Inspired by the apparent success of his clients in obtaining significant tax savings in prior deals, Mr. Jacoby asked Mr. Haber whether a Midco transaction could be used to pay the balance on SMD's accounts receivable.  Mr. Haber said it could.

Together, they set up a sale that Mr. Jacoby believed would give DGI a discount on its obligations to SMD while giving him capital gains treatment on what would otherwise be ordinary income.  Mr. Jacoby retained Michael Salberg, from the firm Graubard Miller,[5] to represent him in connection with the SMD sale.

On January 26, 1999, Mr. Jacoby transferred 18 shares of SMD stock to the Jewish Communal Fund (JCF).[6]  This was the only time that petitioners had transferred not-readily-marketable securities to the JCF.  On the same day Mr. Jacoby entered into a stock purchase agreement with JC Acquisition, LLC, to sell

---

[5] Graubard Miller is also the firm Mr. Jacoby used to incorporate SMD.

[6] The JCF is a public charity.  Donors are able to set up funds with the JCF and recommend grants from their funds to qualified charities of their choice.

[*8] his remaining 182 shares of SMD stock for $2,952,971.[7]  Under the terms of the agreement, $2,232,971 of the purchase price would be immediately paid to Mr. Jacoby and he would receive a promissory note for $720,000.  Additionally, DGI would pay the JCF $292,029 for the 18 shares Mr. Jacoby donated.

Around this time but before the sale Mr. Jacoby transferred to himself SMD's money market account and laptop.  He also executed an assignment and assumption agreement transferring to himself all of SMD's rights in the joint venture agreement with DGI.  At the time of the sale SMD's only asset was the accounts receivable.  Mr. Salberg, Mr. Jacoby's attorney for the transaction, was aware of these transfers, and Mr. Jacoby believed these transfers were legal.

On January 28, 1999, and March 3, 2000, Mr. Jacoby received wire transfers of $2,232,971 and $500,000, respectively.[8]  He also structured or assisted in structuring the payment of $292,029 to the JCF.  He received the remaining $720,000 in 2000.

---

[7]  At all relevant times, JC Acquisition, LLC, was a tax-indifferent entity owned by the Skull Valley Band of Goshute Indians and managed by DGI.  Mr. Haber was the company's president.  The company was represented by counsel from Pryor Cashman for this transaction.

[8]  It is unclear from the record why Mr. Jacoby received the $500,000 wire transfer.

**[*9]** Following the sale of SMD Mr. Jacoby incorporated SMD Capital Corp. (SMD-Delaware), a new wholly owned subchapter S corporation in Delaware. Mr. Salberg handled the incorporation. Under SMD-Delaware Mr. Jacoby continued doing business with DGI, marketing tax strategies under the joint venture agreement.

B.     Foreign Currency Transaction

Another strategy DGI often used was the foreign currency transaction. The foreign currency transaction involved trading in currency options with the potential to make a profit in order to secure tax deductions beyond the economic value of the options. Mr. Jacoby witnessed DGI employing the strategy in transactions with several large companies in 1997 and 1998. These transactions were also reviewed and approved by a number of law and accounting firms.

In the latter part of 1999 David Greenberg, then a partner at KPMG, along with several other KPMG partners, brought four foreign currency transactions to DGI. After those transactions successfully closed, Mr. Greenberg asked Mr. Jacoby whether he would be interested in joining a group of KPMG partners who were planning to use the same strategy for their own personal benefit.

Mr. Jacoby was interested and so became involved in a foreign currency transaction between two limited liability companies (JPF III transaction): JPF III,

[*10] LLC (JPF III), and AD Global Fund, LLC (AD Global). JPF III had two members: Mr. Greenberg and William A. Goddard IV, of the law firm Lee, Goddard & Duffy. AD Global, which was formed on October 31, 1999--a few weeks before the JPF III transaction took place--also had two members: Alpha Consultants, Inc., and DGI. As part of the JPF III transaction, JPF III contributed two option trades involving Japanese yen to AD Global in exchange for a 32.6% interest in AD Global.

Lee, Goddard & Duffy were the attorneys for the transaction. On November 16, 1999, Mr. Jacoby transferred $40,000 from a Bear Stearns account to an account at Southern California Bank. A general ledger from Lee, Goddard & Duffy listing amounts as of December 31, 1999, also showed that the firm had received $40,000 from Mr. Jacoby on November 16, 1999. The transaction itself took place on November 24, 1999.

In December 1999 Mr. Greenberg, as the president of JPF III, and Mr. Jacoby signed an agency agreement with an effective date of November 15, 1999. In the agency agreement Mr. Jacoby appointed JPF III as his agent with respect to the JPF III transaction. However, among the closing documents prepared for the transaction was a contribution agreement entered into by JPF III and AD Global dated November 24, 1999. In this contribution agreement JPF III warranted that it

**[*11]** was acting on its own account and not for the account of another person and that no agency or similar relationship was intended to be created. Mr. Jacoby was never a partner of JPF III, and he did not sign the contribution agreement.

III. Arbitration and Civil Litigation

Around 2001 a dispute arose between Mr. Jacoby and Mr. Haber regarding compensation for the marketing work Mr. Jacoby had performed after the SMD transaction. In May 2001 Mr. Jacoby and SMD-Delaware initiated arbitration proceedings against DGI. The arbitration dispute was dismissed on March 14, 2002. On May 30, 2002, Mr. Jacoby and SMD-Delaware filed a suit against DGI and James Haber in the Supreme Court of the State of New York, County of New York. During the arbitration proceedings and the civil litigation Mr. Jacoby submitted affidavits and testified at a deposition and at trial regarding the SMD stock sale.

IV. Tax Return Preparation

Petitioners' Forms 1040, U.S. Individual Income Tax Return, for 1999 and 2000 were filed on October 18, 2000, and July 12, 2001, respectively. The returns were prepared by their accountants, Goldstein Lewin & Co. (Goldstein Lewin). Mr. Jacoby provided Goldstein Lewin with many documents related to both the

[*12] SMD stock sale and the JPF III transaction, including a tax opinion.[9]

Certified public accountants (C.P.A.s) at Goldstein Lewin worked on petitioners' returns using the information and documents they provided. Mr. Jacoby answered C.P.A.s' questions regarding the transactions. The C.P.A.s also contacted KPMG with questions regarding the JPF III transaction. Gerald Lewin, a named partner of the firm, signed petitioners' 1999 return, and Don Goldstein, another named partner, signed their 2000 return.

V.      Internal Revenue Service (IRS) Audit and Investigation

Around 2003 the IRS began investigating DGI. The civil investigation led to a separate criminal investigation by the IRS Criminal Investigations Division (CID) and the U.S. Attorney's Office for the Southern District of New York. As part of the criminal investigation Mr. Jacoby was interviewed by Federal prosecutors and provided them with documents. He also entered into an

---

[9] Mr. Jacoby obtained the tax opinion regarding the JPF III transaction at the recommendation of Mr. Greenberg sometime after the transaction had closed. Mr. Jacoby paid $10,000 to Lee, Goddard & Duffy for the opinion, which he believed Steve Acosta--a lawyer at the firm--would prepare.

On April 10, 2000, Mr. Greenberg sent Mr. Jacoby a version of the tax opinion, which listed Steve Acosta as the author. The first page of that version states that it was prepared by Steve Acosta for Mr. Goddard. However, a later section of that version of the tax opinion states that the document belongs to KPMG. A second version of the tax opinion, which does not contain any references to KPMG, was provided to Mr. Jacoby at a time not specified in the record.

[*13] agreement to extend the period of limitations for criminal charges, but no charges were ever brought against him.

Around 2011 respondent began an administrative examination of petitioners' 1999 and 2000 returns. Mr. Jacoby provided respondent with records in his possession. Respondent sent a notice of deficiency for 1999 and 2000 to petitioners on April 12, 2012, determining deficiencies of $856,243 for 1999 and $370,348 for 2000, respectively. Respondent determined fraud penalties of $642,182 for 1999 and $277,761 for 2000 under section 6663. Petitioners timely petitioned in response to the notice of deficiency.

VI.    Request for Innocent Spouse Relief

On October 23, 2013, petitioners filed an unopposed motion for leave to file an amended petition. On October 28, 2013, we granted petitioners' motion. The amended petition clarifies that Mrs. Jacoby, as part of these proceedings, is seeking innocent spouse relief under section 6015 and alleges relevant facts.

OPINION

I.    Statute of Limitations

A.    Introduction

Section 6501(a) provides, generally, that the amount of any tax must be assessed within three years of the filing of a return. The notice of deficiency in

[*14] this case was issued more than a decade after the relevant returns were filed. Therefore, the periods of limitations for the years in issue have expired and assessment is barred unless an exception to the general limitations period applies. Respondent argues that the section 6501(c)(1) fraud exception applies. Under section 6501(c)(1), if a taxpayer files "a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time."

The Commissioner has the burden of proving exceptions to the general limitations period. See, e.g., Harlan v. Commissioner, 116 T.C. 31, 39 (2001). To satisfy his burden in this case, respondent must show by clear and convincing evidence that: (1) an underpayment exists; and (2) Mr. Jacoby intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). This is the same as his burden under section 6663 to prove applicability of the civil fraud penalty (which is also at issue). See, e.g., Browning v. Commissioner, T.C. Memo. 2011-261, slip op. at 25.

B.      Underpayment

The SMD stock sale was primarily designed to convert ordinary income (the accounts receivable) into capital gains. See sec. 1221(a)(4). As we have

[*15] previously stated, accounts receivable "cannot be turned into capital gain items by means of a sale." Seward v. Commissioner, T.C. Memo. 1961-114, 1961 Tax Ct. Memo LEXIS 236, at *5 (citing Tunnell v. United States, 259 F.2d 916 (3d Cir. 1958)). Respondent has shown by clear and convincing evidence that, as a result of the SMD stock sale, petitioners underpaid their tax for the two years in issue. Accordingly, an underpayment exists for both years.

C.    Fraudulent Intent

To prove fraudulent intent the Commissioner must show by clear and convincing evidence that a portion of the underpayment for each taxable year in issue was due to fraud. Prof'l Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), aff'd, 748 F.2d 331 (6th Cir. 1984). Mere suspicion, however, does not suffice to prove fraud. Katz v. Commissioner, 90 T.C. 1130, 1144 (1988); Shaw

**[*16]** v. Commissioner, 27 T.C. 561, 569-570 (1956), aff'd, 252 F.2d 681 (6th Cir. 1958).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These badges of fraud include: (1) understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. Spies, 317 U.S. at 499; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors may constitute persuasive evidence. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), aff'g per curiam T.C. Memo. 1982-603.

Respondent asserts that six badges of fraud are present in this case, while petitioners argue that none are present. We address each of the asserted badges of fraud below.

**[*17]**      1.      <u>Understatement of Income</u>

Respondent argues that (1) petitioners understated their income on their 1999 and 2000 tax returns and (2) that fact is sufficient to prove that this badge of fraud is present in this case. Petitioners argue that respondent "misses the point", because the key issue is whether Mr. Jacoby intended to evade taxes by understating their income. They further argue that the record shows that Mr. Jacoby lacked that intent and that he believed the SMD stock sale and the JPF III transaction were legitimate strategies, and the details of the transactions were fully disclosed to his C.P.A.s at Goldstein Lewin, who he trusted to properly report the transactions.

The Court of Appeals for the Eleventh Circuit has held that a "mere understatement of income does not constitute proof of fraud" while a "'[c]onsistent and substantial understatement of income is by itself strong evidence of fraud.'"[10] <u>Korecky v. Commissioner</u>, 781 F.2d 1566, 1568 (11th Cir. 1986) (quoting <u>Merritt v. Commissioner</u>, 301 F.2d 484, 487 (5th Cir. 1962), <u>aff'g</u> T.C. Memo. 1959-172), <u>aff'g</u> T.C. Memo. 1985-63. As we discussed <u>supra</u>, respondent has proven that, as a result of the SMD stock sale, petitioners

---

[10] Absent a stipulation to the contrary, this case is appealable to the Court of Appeals for the Eleventh Circuit. <u>See</u> sec. 7482(b).

**[\*18]** improperly reported ordinary income as capital gains for 1999 and 2000. This led to understatements on their returns for both years. However, respondent has not proven, nor even suggested, that petitioners understated their income for any other year. We find that respondent has failed to prove the existence of consistent and substantial understatements of income.

Furthermore, the record--including the testimony of several C.P.A.s from Goldstein Lewin--convinces us that petitioners fully disclosed the details of both the SMD stock sale and the JPF III transaction to the C.P.A.s preparing their returns. Petitioners have demonstrated that they relied on Goldstein Lewin to report the transactions accurately on their returns. Therefore, while understatements exist for 1999 and 2000, respondent has failed to prove that petitioners intended to understate their tax for either year.

### 2. Implausible or Inconsistent Explanations of Behavior

Petitioners argue that Mr. Jacoby believed that the SMD stock sale and the JPF III transaction were legitimate and that he lacked fraudulent intent. Respondent argues that petitioners' explanation of Mr. Jacoby's behavior is implausible and unsupported by the record and that Mr. Jacoby actually devised the SMD stock sale independently.

[*19] Respondent's argument is built on three premises: (1) the transactions are different from any of the strategies marketed to Mr. Jacoby's clients while he worked at Twenty-First Securities and with DGI; (2) Mr. Jacoby did not seek tax advice from anyone else with regard to the SMD stock sale or the JPF III transaction; and (3) Mr. Jacoby was actually well versed in tax. Petitioners argue that the record, and Mr. Jacoby's testimony in particular, contradicts each of respondent's premises. Respondent questions Mr. Jacoby's credibility and argues that his testimony was self-serving and should be disregarded. As to Mr. Jacoby's credibility, we disagree with respondent. At trial we found Mr. Jacoby to be a credible witness, and respondent has not offered a persuasive reason to disbelieve his testimony.

### a. Involvement in Similar Transactions

Respondent claims that the SMD stock sale was different from any of the strategies that Mr. Jacoby had previously marketed to the extent it involved the sale of an S corporation whose only asset was accounts receivable. The record shows, however, that Mr. Jacoby had previously witnessed clients engaging in transactions involving S corporations as well as transactions involving entities that held only ordinary income assets--transactions that had been approved by various firms and seemed legitimate at the time. While there were no transactions

[*20] involving entities whose only asset was accounts receivable, we find it plausible that Mr. Jacoby believed the SMD transaction was sufficiently similar to prior transactions to not raise any concerns.

### b. Help From Tax Experts

According to respondent, "Mr. Jacoby, on his own and without any outside advice, designed the nominal 'sale' of SMD-NY stock". However, it is clear from his testimony that Mr. Jacoby came up with the idea for the SMD stock sale after witnessing earlier DGI transactions and spoke with Mr. Haber regarding the legitimacy of the sale before initiating the transaction. Moreover, he fully disclosed the details of the transaction and provided all the documents he had relating to the two transactions to his accountants at Goldstein Lewin with the expectation that they would report it appropriately on petitioners' returns.

### c. Lack of Tax Expertise

In many prior cases we have found taxpayers lacked fraudulent intent because of their lack of financial and tax expertise. See, e.g., Avenell v. Commissioner, T.C. Memo. 2012-32. Compared to those taxpayers, Mr. Jacoby cannot be said to lack sophistication. He holds both an accounting and a law degree and has worked at an accounting firm, a law firm (where he handled some tax matters), and several financial services firms. On closer examination,

[*21] however, Mr. Jacoby's tax credentials are not as strong as they first appear. While he was hired by a prestigious accounting firm, Touche Ross & Co., Mr. Jacoby worked there for only a short time and only in its auditing department. He had no involvement with the tax side of the firm. In law school he did not specialize in tax law, and he does not have an LL.M. in taxation. Moreover, while he did some tax-related work at the law firm Burlingham, Underwood & Lord, that work does not appear to have been extensive, and he was asked to leave the firm after only six months on the job.

When he went on to market strategies for Twenty-First and DGI, the record shows that it was the lawyers and accountants, such as Mr. Haber, who handled the development of the strategies. Respondent has not shown, by clear and convincing evidence, that Mr. Jacoby was anything more than a marketer who relied on tax specialists to devise and vet the strategies.

### d. Conclusion

Respondent has failed to prove by clear and convincing evidence that (1) the transactions were substantially different from any of the strategies marketed to Mr. Jacoby's clients while he worked at Twenty-First Securities and with DGI; (2) Mr. Jacoby did not seek tax advice from anyone with regard to the 1999 and 2000 transactions; and (3) Mr. Jacoby was actually well versed in tax. Accordingly, Mr.

**[*22]** Jacoby's agreement explanation of his behavior was neither inconsistent nor implausible.

### 3. Concealment of Income or Assets

Respondent argues that Mr. Jacoby never invested money in the JPF III transaction and was never a partner in JPF III and that JPF III never acted as his agent. Respondent also argues that even if JPF III had been acting as Mr. Jacoby's agent in the JPF III transaction, petitioners' 1999 and 2000 tax returns concealed income by hiding the existence of the principal-agent relationship. Petitioners argue that there is no requirement to disclose the existence of such principal-agent relationships and that, regardless, Mr. Jacoby did not intentionally conceal any income or assets because he fully disclosed the details of the foreign currency transaction to the accountants who prepared petitioners' returns.

As we discuss infra, it is unclear from the record whether a principal-agent relationship in fact existed between Mr. Jacoby and JPF III. However, contrary to respondent's position, the evidence does show that petitioners transferred $40,000 to an account controlled by Lee, Goddard & Duffy, the JPF III transaction counsel, around the date of the transaction. This leads us to believe that petitioners did invest some amount of money in the JPF III transaction. Regardless, on the basis of the testimony and documentary evidence presented, it appears that Mr. Jacoby

**[*23]** believed a principal-agent relationship existed and provided his accountants and Goldstein Lewin with all the documents relevant to the transaction, with the expectation that the firm would report the transaction appropriately on petitioners' returns.

Moreover, respondent has not cited any authority in support of his argument that petitioners were required to disclose any principal-agent relationships on their returns. On the basis of the record it cannot be said that petitioners concealed that information.

### 4. Failure To Cooperate

Respondent argues that Mr. Jacoby failed to cooperate with the tax authorities because, during the administrative examination of petitioners' 1999 and 2000 tax returns, the IRS requested an opportunity to interview Mr. Jacoby but he "declined to make himself available for such an interview." Petitioners argue that the evidence shows that, in regard to the SMD stock sale and the JPF III transaction, "Mr. Jacoby was forthcoming with the authorities" and "cooperated fully".

The only evidence respondent cites to show that Mr. Jacoby failed to cooperate is the following testimony elicited during direct examination:

[*24] Q    During the audit phase of this case, you were represented by Mel Lefkowitz. Is that correct?

A    Yes.

Q    And were you aware that the Internal Revenue Service asked for the opportunity to meet with you, to Mr. Lefkowitz?

A    Yes.

Q    Thank you.

We agree with petitioners that the evidence does not show that Mr. Jacoby failed to cooperate with tax authorities. Petitioners have demonstrated that Mr. Jacoby cooperated with Federal prosecutors during the 2003 criminal investigation of DGI by meeting with prosecutors and CID agents. He answered the investigators' questions regarding the SMD stock sale and the JPF III transaction and even entered into a stipulation extending the period of limitations for criminal charges. Petitioners also provided respondent with copious documents and information in response to respondent's information document requests during the IRS' administrative examination many years later. In comparison to the ambiguous testimony highlighted by respondent, the evidence shows that Mr. Jacoby did provide the tax authorities with substantial cooperation.

**[*25]**      5.      <u>Filing False Documents</u>

Respondent argues that petitioners filed several false documents with the IRS.  In particular, respondent draws attention to petitioners' 1999 and 2000 Federal income tax returns, an unsigned and backdated agency agreement with JPF III, and the different versions of the tax opinion.  Petitioners argue that the agency agreement was not improper as it was prepared at the suggestion of Mr. Jacoby's counsel and was dated "effective as of" a certain date.  As to the tax opinion, petitioners argue that Mr. Jacoby was unaware that the tax opinion had been prepared by someone other than Mr. Acosta until many years after petitioners' returns had been prepared.  Petitioners also challenge respondent's position that the authorship issue renders the tax opinion fraudulent.

Filing a document intending to conceal, mislead, or prevent the collection of tax is an indicium of civil fraud.  <u>See</u> <u>Spies</u>, 317 U.S. at 499.  Specifically, filing a false document with the IRS is an affirmative act of misrepresentation that may indicate fraud.  <u>See</u> <u>Zell v. Commissioner</u>, 763 F.2d 1139, 1146 (10th Cir. 1985) (holding false withholding certificates were evidence of fraud), <u>aff'g</u> T.C. Memo. 1984-152.

Regarding the agency agreement, there is a distinction between an effective date provision seeking to memorialize a prior oral agreement and an attempt to

**[\*26]** backdate an agreement in order to retroactively obtain an unwarranted tax benefit. See Moore v. Commissioner, T.C. Memo. 2007-134, slip op. at 37. The agency agreement states that it is "made effective" as of November 15, 1999. Regardless of when the agency agreement was made effective, however, the fact that the contribution agreement between JPF III and AD Global states that JPF III was not acting as an agent raises serious concerns as to the legitimacy of the agency agreement. Nevertheless, there is no indication that Mr. Jacoby was aware of the contribution agreement or the discrepancy between it and the agency agreement--both of which were prepared by the JPF III transaction counsel, Lee, Goddard & Duffy. Consequently, respondent has failed to show, by clear and convincing evidence, that Mr. Jacoby knew that the agency agreement was false or that he submitted it with an intent to mislead.

As to the tax opinion, the fact that Mr. Acosta did not draft it is a concern; however, there is no indication that Mr. Jacoby was aware of the discrepancy in authorship, and we agree with petitioners that these questions regarding the authorship of the tax opinion do not render the tax opinion fraudulent.

6.    Pattern of Behavior Indicating an Intent To Mislead

Respondent argues that "Mr. Jacoby's entire pattern of behavior * * * was consistent with a person attempting to conceal transactions from the Service that

[*27] would result in underpayments". Petitioners argue that Mr. Jacoby's pattern of behavior is consistent with their position that he was just a marketer and believed the SMD stock sale and the JPF III transaction were legitimate.

Throughout these proceedings--as well as the prior arbitration proceedings, civil litigation, and administrative examination--Mr. Jacoby has candidly admitted that the primary motive for the SMD stock sale was to achieve tax savings. Such an admission may cast the transaction in a negative light. But we are looking here to whether petitioners, and particularly Mr. Jacoby, held an intent to mislead. We find that they did not.

Mr. Jacoby's actions and behavior as evidenced in the record are consistent with petitioners' narrative that Mr. Jacoby was primarily a successful salesman who believed that he could achieve legitimate tax savings by engaging in transactions that (1) were similar to those he was successfully marketing to his clients, (2) had been approved by lawyers and accountants who were considered to be experts in the field, (3) were executed by counsel, and (4) were reported on returns prepared by a reputable C.P.A. firm. While he and the various tax experts he worked with took mistaken positions, respondent has failed to show that Mr. Jacoby was acting with an intent to mislead.

**[*28]**     7.     <u>Summary of Badges of Fraud</u>

As noted above, respondent alleges that six factors are present in this case. We conclude that none of these badges of fraud are present in this case. While Mr. Jacoby had some education and experience in tax law, and the underlying transactions may have been improper, respondent has not carried his substantial burden of proving by clear and convincing evidence that Mr. Jacoby intended to commit fraud.

II.     <u>Conclusion</u>

After reviewing all of the facts and circumstances, we conclude that respondent has failed to sustain his heavy burden of proving by clear and convincing evidence that, some 15 years ago, petitioners intended to evade tax known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax for the years in issue. As we noted <u>supra</u>, absent a finding of fraud the periods of limitations for both of the years in issue expired, and we find that the periods of limitations for both years have indeed expired. Accordingly, petitioners are not liable for the deficiencies, additions to tax, or penalties for the years in issue. This finding also renders moot Mrs. Jacoby's request for innocent spouse relief under section 6015, and we will dismiss it as such.

**[\*29]** In reaching our holding herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order and decision will be entered</u>.